## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| WILSON CONSULTING COMPANY SERVICES INC. d/b/a WCS SOLUTIONS, <br><br>      Plaintiff/Counterclaim Defendant, <br><br> v. <br><br> AUTOM8TION, LLC, *et al.*, <br><br>      Defendants/Counterclaim Plaintiffs. | **MEMORANDUM DECISION AND ORDER ON THIRD-PARTY DEFENDANT GEORGE WILSON'S MOTION TO DISMISS** <br><br> Case No.  2:24-cv-0044-AMA <br><br> Hon. Ann Marie McIff Allen |
| AUTOM8TION, LLC, a Utah limited liability company, <br><br>      Third-Party Plaintiff, <br><br> v. <br><br> GEORGE WILSON, <br><br>      Third-Party Defendant. | |

Before the court is Third-Party Defendant George Wilson's motion to dismiss for lack of personal jurisdiction (the "Motion") and the supporting declaration of George Wilson (the "Wilson Declaration").[1]  Third-Party Plaintiff Autom8tion, LLC

---

[1]  (*See* Mot. to Dismiss, ECF No. 22, and Declaration of George Wilson, ECF No. 22-1.)

filed a brief in opposition to the Motion (the "Opposition") and the declaration of Jeffery Long in support (the "Long Declaration").[2]

George Wilson—a resident and citizen of Ontario, Canada—claims he has never traveled to Utah and asserts that he lacks the specific contacts with Utah that would allow this court's exercise of personal jurisdiction to comport with due process.  In response, Autom8tion argues that, regardless of Mr. Wilson's citizenship and residence and his lack of a physical presence in Utah, the fact that Mr. Wilson was hired as COO of Autom8tion—which is a Utah limited liability company—and signed an employment contract to that effect, assisted in drafting documents for use by Autom8tion in Utah, and regularly communicated with Autom8tion and other persons in Utah establishes that he purposefully directed his activities at residents of Utah so that specific jurisdiction over him for the claims asserted in the Third-Party Complaint is proper.

For the reasons discussed below, the court finds that Autom8tion has met the prima facie standard to establish specific personal jurisdiction over Mr. Wilson. Accordingly, Mr. Wilson's Motion is DENIED.[3]

---

[2]    (*See* Pl's Mem. Opposing Third-Part Def's Mot., ECF No. 23 and the Declaration of Jeffery Long, ECF No. 23-1.)

[3]    Pursuant to Local Rule DUCivR 7-1(g), the court finds oral argument unnecessary and decides the motion based on the parties' written briefing.

BACKGROUND FACTS[4]

Autom8tion is a Utah limited liability company operating out of Utah County, Utah that conducts business in Utah.  It is a named Defendant in the underlying action and the Third-Party Plaintiff in the action against Mr. Wilson. Jeffery Long is also a named Defendant in the underlying action.  Mr. Long is a member and manager of Autom8tion and a resident of Utah.  Third-Party Defendant George Wilson is a resident and citizen of Ontario, Canada.  He is the sole shareholder, president, director, and chief operating officer of Wilson Consulting Services Inc. ("WCS Solutions"), a Canadian corporation, which is the named Plaintiff in the underlying action.[5]

Sometime in or about 2015 Mr. Long posted a message on his Facebook group that he was looking for a programmer/systems administrator to do work for Autom8tion.  Mr. Wilson contacted Mr. Long and offered his services.[6]  Mr. Long

---

[4]     These facts are taken from the Amended Third-Party Complaint (ECF No. 11), the Motion (ECF No. 22) and the Wilson Declaration (ECF No. 22-1), the Opposition (ECF No. 23) and the Long Declaration (ECF No. 23-1), and other documents, such as the Verified Complaint filed by WCS Solutions and attached exhibits (ECF No. 1-1 & Exs. 1–5), and WCS Solutions' Verified Answer to Autm8tion's counterclaim.  (ECF No. 21.)

[5]     (*See* ECF No. 22-1 at ¶3.)

[6]     In his declaration Mr. Long asserts that Mr. Wilson "reached out to me [in Utah] and offered to assist in fixing the issue."  (*See* ECF No. 23-1 at ¶¶5–6.)

hired Mr. Wilson, who then worked with Autom8tion on various projects for two years.  Mr. Wilson did this work remotely from Canada.[7]

In or about September 2020, Mr. Wilson reconnected with Mr. Long by telephone.[8]  Mr. Wilson and Mr. Long then began discussing the possibility of Mr. Wilson working as an executive of Autom8tion.[9]  In a "Chief Operating Officer Employment Agreement" dated October 2, 2020 (the "COO Agreement"),[10] Mr. Wilson agreed to serve as Autom8tion's Chief Operating Officer ("COO") for a period of three years.  The COO Agreement identifies Autom8tion as a company located in American Fork, Utah and it was signed by "Autom8ton LLC" by Mr. Long as Chief Executive Officer of Autom8tion.[11]  The counterparty to the COO Agreement is "George Wilson, Contracted [sic] through WCS Solutions ..., the undersigned individual ('COO')."[12]  Mr. Wilson personally signed the agreement as "CHIEF

---

[7]    In his declaration, Mr. Wilson attests that "**I** worked remotely from Canada as a contractor hired through WCS Solutions assisting Mr. Long/Autom8tion LLC with various software projects for approximately two years."  (*See* ECF No. 22-1 at ¶8 (emphasis added).)

[8]    The parties have not identified who initiated this call.

[9]    Mr. Wilson asserts that Mr. Long "asked if **I** would be interested in coming back to work for him and his company Autom8tion, LLC."  (*See* ECF No. 22-1 at ¶8 (emphasis added).)

[10]    The COO Agreement is attached as Exhibit 1 to WCS Solutions' Verified Compliant. (See ECF No. 1-1, Ex. 1.)

[11]    (*See* ECF No. 1-1, Ex. 1 at page 32.)

[12]    (*See id*.)

OPERATING OFFICER."[13]  Although Mr. Wilson now avers that he signed the

COO Agreement "in my role as Chief Operating Officer of WCS Solutions,"[14] there

is no express notation on the COO Agreement that Mr. Wilson was signing on

behalf of WCS Solutions.[15]  Moreover, Autom8tion has alleged that Mr. Wilson

signed the COO Agreement "in his personal capacity."[16]

       Mr. Wilson's duties and responsibilities under the COO Agreement required

him to "report to the CEO [Mr. Long] and the Board of Directors [of Autom8tion],"

and "to work a minimum of four days per week at a minimum of 10-12 fours per

day" for Autom8tion.[17]  The COO Agreement stated further that Mr. Wilson "shall

be paid a base salary … at an annual rate of $240,000 USD."[18]  The COO

Agreement required Mr. Wilson, as COO of Autom8tion, to "devote the substantial

portion of his entire business time, attention and energy, exclusively to the business

and affairs of [Autom8tion] and its affiliates."[19]  Mr. Wilson also agreed that he was

---

[13]     (*Id.*)

[14]     (*See* ECF No. 22-1 at ¶10.)

[15]     Notably, WCS Solutions admits that it was the party that drafted the COO Agreement.  (*See* ECF No. 21 at ¶11; ECF No. 6 at ¶11.)

[16]     (*See* ECF No. 11 at ¶16.)

[17]     (*See* ECF No. 1-1, Ex. 1 at ¶1(b).)

[18]     (*See id.* at ¶2(a).)

[19]     (*See id.* at ¶3.)

unaware of any obligations that were "inconsistent with the terms of the [COO]

Agreement or COO's employment with [Autom8tion]."[20]

The COO Agreement had a merger clause that provided that the COO

Agreement contained "the entire agreement and understanding between the parties

hereto [Autom8tion and Mr. Wilson]," and that it "supersedes any prior or

contemporaneous written or oral agreement, representations and warranties

between them respecting the subject matter hereof."[21]  Any notices required under

the COO Agreement were to be sent to Mr. Wilson at his "residence" and to

Autom8tion at its "principal office," which was in Utah.[22]  The COO Agreement also

contains a governing law provision that applies "the laws of the State of North

Carolina" to its construction.[23]

Mr. Wilson also agreed in the COO Agreement that "during and after

termination of [his] employment," he would "furnish such information and proper

assistance to [Autom8tion] as may reasonably be required by [Autom8tion] in

connection with any litigation in which [Autom8tion] or any of its subsidiaries or

affiliates is, or may become a party."[24]

---

[20]     (*See id*. at ¶12.)

[21]     (*See id*. at ¶13(c).)

[22]     (*See id*. at ¶13(j).)

[23]     (*See id*. at ¶13(b).)

[24]     (*See id*. at ¶13(k).)

Notably, WCS Solutions is not identified as a signatory to the COO Agreement. And WCS Solutions it is not expressly identified as having any duties or responsibilities under the COO Agreement or expressly identified as entitled to receive any notices or receive any payments under the COO Agreement.[25]

On October 5, 2020, following the signing of the COO Agreement, Mr. Wilson began working as Autom8tion's COO where, among other things, he was personally "providing advice and expertise to Mr. Long," who was in Utah, he was managing Autom8tion's "IT infrastructure," some of which was presumably in Utah, he was providing Autom8tion with "client and vendor support," and was providing bookkeeping services for Autom8tion.[26] Among these bookkeeping services, Mr. Wilson was in charge of "making sure that payroll and operating costs [of Autom8tion] were paid every month."[27] Mr. Long states that Autom8tion only

---

[25]     Although the COO Agreement provides that a salary was to be paid to Mr. Wilson for his services, Mr. Long acknowledges that "Mr. Wilson informed Autom8tion that he wanted his compensation to be paid via Consulting Solutions Inc ('WCS')." (*See* ECF No. 23-1 at ¶11.) Similarly, Mr. Wilson claims he "never personally received any payment from Autom8tion, LLC" and that "Autom8tion, LLC paid WCS Solutions." (*See* ECF No. 22-1 at ¶11.) Yet in WCS Solutions' Verified Complaint, which was verified by Mr. Wilson, it alleges that while some of Mr. Wilson's deferred salary was paid to WCS Solutions, it was a salary that was "owed to Mr. Wilson under the COO Agreement." (*See* ECF No. 1-1 at ¶30.) Whether Mr. Wilson received his salary due for his work as Autom8tion's COO directly from Autom8tion or indirectly through WCS Solutions does not change the jurisdictional analysis. In addition, neither party has addressed whether, as a matter of North Carolina law, the COO Agreement should be construed as an agreement between WCS Solutions and Autom8tion or an agreement between Mr. Wilson and Autom8tion.

[26]     (*See* ECF No. 22-1 at ¶13; ECF No. 1-1 at ¶12.)

[27]     (*See* ECF No. 1-1 at ¶13; ECF No. 21 at ¶14, ECF No. 6 at ¶14.)

communicated with Mr. Wilson and never talked with anyone else who claimed to be associated with or employed by WCS Solutions.[28]

It appears undisputed that during the three-year period while he was working as Autom8tion's COO, Mr. Wilson engaged in numerous, potentially thousands, of communications with Auom8tion and Mr. Long by telephone, email, and video.[29]  While Mr. Wilson participated from his residence in Canada, Mr. Long and Autom8tion participated from Utah.

In or about April 2022, Autom8tion was having financial difficulties.  Mr. Wilson claims that in his role as WCS Solutions' president he agreed to work with Autom8tion to consolidate Autom8tion's debts into a single debt that would be owed directly to WCS Solutions.[30]  Mr. Wilson then drafted a Revenue Purchase Agreement (the "RPA") between WCS Solutions and Autom8tion, which was signed on or about July 27, 2022.[31]

Sometimes thereafter, in September 2023, Autom8tion and WCS Solutions discussed an asset purchase agreement/settlement agreement under which WCS Solutions would purchase all the assets of Autom8tion.[32]  It is alleged that Mr.

---

[28]     (*See* ECF No. 23-1 at ¶14.)

[29]     (*See* ECF No. 23-1 at ¶16.)

[30]     (*See* ECF No. 1-1 at ¶27.)

[31]     (*See* ECF No. 1-1 at ¶¶27–28, 47; *see also* ECF No. 22-1, Ex. 2 [Revenue Purchase Agreement].)

[32]     (*See* ECF No. 6 at ¶ 41; ECF No. 21 at ¶41; ECF No. 11 at ¶ 17.)

Wilson participated by video conference call with Mr. Long in Utah to negotiate the terms of that agreement.[33]  During this period, Mr. Wilson was also provided access to and logged into multiple Autom8tion accounts.[34]  Soon thereafter, Mr. Wilson was informed he was terminated from his position as COO.[35]

On or about December 27, 2023, WCS Solutions commenced the underlying action in the Fourth Judicial District Court for the State of Utah.  WCS Solutions asserted many claims, including an alter-ego claim, breach of the COO Agreement, breach of the RPA, voidable transfer under Utah law, and fraud in the inducement.[36]  It appears that WCS Solutions did so with the approval of or under the direction of Mr. Wilson, who as WCS Solutions' president, personally verified all the allegations made in the underlying complaint.[37]

On January 18, 2024, Autom8tion and the other named defendants removed this action to this court pursuant to 28 U.S.C. 1441 claiming there is complete diversity among the parties under 28 U.S.C. § 1332.[38]  On February 1, 2024, Autom8tion filed a Third-Party Complaint against Mr. Wilson asserting:  (1) a state

---

[33]    (*See* ECF No. 11 at ¶18.)

[34]    (*See id*. at ¶¶22–23.)

[35]    (*See* ECF No. 1-1 at ¶67.)

[36]    (*See* ECF No. 1-1 at ¶¶84–153.)

[37]    (*See* ECF No. 1-1 at page 25; *see also* ECF No. 23 at 2–3 & ¶¶4, 13.))

[38]    (*See* ECF No. 1.)

law claim of tortious interference with business relations; (2) a violation of Utah's Trade Secrets Act; (3) a violation of the federal Defense of Trade Secrets Act; and (4) an alter-ego claim alleging that Mr. Wilson and WCS Solutions do not have separate existences and that Mr. Wilson has abused the corporate form and failed to follow corporate formalities.[39]  Summarized, Autom8tion's claims against Mr. Wilson are premised on acts he took while he was COO of Autom8tion, including his improper disclosure of Autom8tion's confidential information to third parties, his wrongful disclosure of Autom8tion's trade secrets, his efforts to undermine the RPA between Autom8tion and WCS Solutions, and his direction to WCS Solutions to conduct business unlawfully in Utah.[40]

On March 21, 2024, Mr. Wilson filed the Motion now before the court seeking to dismiss the Third-Party Complaint for lack of personal jurisdiction.[41]

## LEGAL STANDARD

Where, as here, a defendant has filed a motion to dismiss challenging personal jurisdiction, the plaintiff bears the burden of establishing that jurisdiction exists.  *See XMission, L.C. v. Fluent LLC*, 955 F.3d 833, 839 (10th Cir. 2020) (citing *OMI Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1091 (10th Cir.

---

[39]     (*See* ECF No. 11 at ¶¶37–85.)

[40]     (*See, e.g., id*. at ¶¶40, 49, 67.)

[41]     (*See* ECF No. 22.)

1998)).  And where the motion to dismiss for lack of jurisdiction is decided on the

basis of affidavits and other written material and the court has not held an

evidentiary hearing, the plaintiff "'need only make a prima facie showing that

jurisdiction exists.'" *Id.* (quoting *Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th

Cir. 1995).

To satisfy the prima facie standard the plaintiff may present evidence though

its uncontested allegations or through declarations "'that if true would support

jurisdiction over the defendant.'"  *Id.* (quoting *OMI Holdings*, 149 F.3d at 1091).

"The 'well pled facts' of the complaint must be accepted as true if uncontroverted by

the defendant's affidavits, and factual disputes at this initial stage must be resolved

in the plaintiff's favor when the parties present conflicting affidavits.*" Fed. Deposit

Ins. Corp. v. Oaklawn Apartments*, 959 F.2d 170, 174 (10th Cir. 1992) (citation

omitted); *see also Dudnikov v. Chalk & Vermillion Fine Arts,* 514 F.3d 1063, 1070

(10th Cir. 2008) (noting that "any factual disputes in the parties' affidavits must be

resolved in plaintiffs' favor") (citation omitted).

Here, in deciding if the court's exercise of personal jurisdiction over Mr.

Wilson is proper, the court must determine if doing so comports with due process.

*See Fluent LLC,* 955 F.3d at 839 (recognizing that because Utah's long-arm

jurisdiction statue confers jurisdiction to the full extent permitted by the Due

Process Clause of the U.S. Constitution the only inquiry is a "due process inquiry").

That analysis requires the court to examine whether Mr. Wilson's contacts with

Utah are enough so that his having to defend a lawsuit in Utah "would not offend

traditional notions of fair play and substantial justice," and that by virtue of these contacts Mr. Wilson "'should reasonably anticipate being haled into court there.'" *See id.* at 839–40 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980) and *International Shoe Co. v. State of Washington*, 326 U.S. 310, 316 (1945)).

Because it is undisputed that the court lacks general jurisdiction over Mr. Wilson, the issue in this action is whether specific jurisdiction exists—*i.e.*, did Mr. Wilson "'purposefully direct[]'" his activities at residents of Utah and do Autom8tion's alleged injuries "'arise out of or relate to those activities.'" *Fluent LLC*, 955 F.3d at 840 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).

But even if Autom8tion establishes sufficient Utah-related activities so that specific jurisdiction over Mr. Wilson appears appropriate, Mr. Wilson may still defeat jurisdiction if he can make a compelling case that the exercise of jurisdiction over him would be "'unreasonable.'" *See id.* (quoting *Burger King*, 471 U.S. at 477). Such unreasonableness is to be examined under a five-part test: (1) what is the burden on Mr. Wilson; (2) what is Utah's interest in resolving the dispute; (3) what is Autom8tion's interest in receiving convenient and effective relief; (4) what is interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) what is the shared interest of the several states (in this case Canada's and Utah's) in furthering fundamental social policies. *See id.* at 840

(citing *Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 903 (10th Cir.

2017)).


ANALYSIS

Autom8tion asserts that Mr. Wilson has enough minimum contacts with

Utah to support specific jurisdiction.  Among these contacts are:

> (1) Mr. Wilson's three-year employment as COO of Autom8tion, which is a
> Utah limited liability company located in Utah, where his responsibilities
> and duties included, among other things, managing Autom8tion's bank
> records, accounts payable and receivable accounts, and making sure
> Autom8tion's payroll and operating costs were paid every month;
>
> (2) Mr. Wilson's presentation of the COO Agreement in Utah to Autom8tion
> and Mr. Long, a Utah resident;
>
> (3) Mr. Wilson's personal entry into the COO Agreement, which he signed on
> or about October 2, 2020, and which identifies Autom8tion as a Utah
> limited liability company located in Utah;
>
> (4) Mr. Wilson's "thousands" of communications to Mr. Long and Autom8tion
> in Utah that concerned Autom8tion's business in Utah;
>
> (5) Mr. Wilson's admission that he is the sole shareholder, president, director,
> and the chief operating officer of WCS Solutions;
>
> (6) Mr. Wilson's approval and/or direction to WCS Solutions to file the
> underlying complaint, which he personally verified, in a Utah state court
> asserting claims under the COO Agreement concerning Mr. Wilson's
> employment and rights under the COO Agreement for his work as COO of
> Autom8tion;
>
> (7) Mr. Wilson's actions in conducting business in Utah including his drafting
> and presentation of the RPA to Autom8tion;
>
> (8) Mr. Wilson's negotiations and discussions with Mr. Long and Autom8tion
> concerning the asset purchase agreement/settlement agreement in
> September 2023; and

(9) Mr. Wilson's receipt of login credentials from Autom8tion during the negotiations of the asset purchase agreement which he used to access Autom8tion's confidential information that he then allegedly improperly conveyed to others.

### 1.  Mr. Wilson Has Purposefully Directed His Actions at Utah

Autom8tion correctly notes that "for a court to exercise specific jurisdiction over a claim, there must be an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum State."[42]  Here, Autom8tion asserts that all its claims against Mr. Wilson arise out of his Utah-related activities.  Autom8tion's claims—tortious interference, state and federal trade secrets violations, and alter-ego—are all tort-based claims.[43]  As Autom8tion also notes, specific jurisdiction for such claims can arise "when an out-of-state defendant's intentional conduct targets and has substantial harmful effects

---

[42]    (*See* ECF No. 23 at 13 (quoting *Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco County*, 582 U.S. 255, 264 (2017) (cleaned up)).  *See also Fluent LLC*, 955 F.3d at 841 (noting that plaintiff satisfies the prima facie burden by showing that "an out-of-state defendant's intentional conduct targets and has substantial harmful effects in the forum state") (quoting *Old Republic*, 877 F.3d at 907).

[43]    Its unclear to what extent Autom8tion's alter-ego claim may also be construed as a contract-based claim.  There is no doubt that some of Autom8tion's counterclaims against WCS Solutions sound in contract and that, should an alter-ego claim be sustained, Mr. Wilson might be jointly and severally with WCS Solutions on such claims.  Because some of these claims arise from the COO Agreement and Mr. Wilson's performance as COO of Automation, Mr. Wilson' actions in entering into and performing under the three-year COO Agreement that called for his employment by a Utah company that was operating in Utah, and required him to manage the Utah's company's financial assets and some of its business activities, even if done remotely from Canada, support the conclusion that Mr. Wilson purposefully directed his activities into the State of Utah.

in the forum state."[44]   And harmful effects are established upon a showing that the defendant engaged in an intentional action that was expressly aimed at the forum with knowledge that the brunt of the injury would be felt in the forum.  *See Old Republic*, 877 F.3d at 907 (citations omitted.)

Autom8tion argues (and the court agrees) that Mr. Wilson directed his tortious actions at Utah.  It cannot be disputed that Mr. Wilson knew his actions would have an impact in Utah.  He knew Autom8tion was a Utah company.  He was in fact hired by Autom8tion to influence and direct Autom8tion's activities, many of which took place in Utah.  He drafted and negotiated agreements that he sent to a Autom8tion in Utah.  And as alleged, Mr. Wilson's conduct in improperly disclosing Autom8tion's trade secrets and his tortious interference with the asset purchase agreement were actions which were aimed at Autom8tion in Utah that would cause harm to Autom8tion in Utah.

Recently, the Tenth Circuit confirmed that even less direct conduct in Utah establishes purposeful direction to support personal jurisdiction.  In *XMission, L.C. v. PureHealth Research*, 105 F.4th 1300, 1311 (10th Cir. 2024), the Tenth Circuit held that a defendant's sending of emails to plaintiff's customers—persons that the defendant knew lived in Utah—was enough to establish that the defendant

---

[44]   (*See* ECF No. 23 at 11 (quoting *Old Republic*, 877 F.3d at 907 (citing *Calder v. Jones*, 465 U.S. 783, 790-91 (1984))).)

"expressly aimed its conduct at Utah."[45]  Further, by knowingly engaging with those

Utah residents the court agreed with the plaintiff that the defendant "has

knowingly inflicted harm on a Utah business." *Id*. at 1312.  The court concluded

that such actions established a prima facie showing that the defendant had

"purposefully directed its conduct at [Utah]."  *Id*.  By alleging that Mr. Wilson

improperly disclosed AutoM8tion's trade secrets and wrongfully interfered with its

business, Autom8tion has similarly made a prima facie showing that Mr. Wilson

purposefully directed his conduct at Utah sufficient to support personal jurisdiction.

*See id*. at 1211–12.

     *2.  It is Mr. Wilson's Own Conduct That Establishes Jurisdiction*

     Mr. Wilson argues that his work as COO of Autom8tion may not be used to

establish the necessary contacts to support specific jurisdiction over him.  He

asserts that he never directed any commerce targeting Utah, but only WCS

Solutions did.[46]  More specifically, Mr. Wilson claims that his acceptance of an offer

---

[45]  In fact, the court noted that the fact that defendant "knew its newsletter emails were going directly to Utah residents—is fatal to is appellate position on purposeful direction." *See PureHealth*, 105 F.4th at 1310.

[46]  To the extent Mr. Wilson is presenting an argument that his communications or actions as a corporate officer of WCS Solution may not be attributed to him under a jurisdictional analysis, his argument is rejected.  Such an argument appears to be premised on the so-called "fiduciary shield" doctrine.  Under that doctrine when an individual defendant who is a corporate officer or agent of a corporate defendant does business or directs contacts toward a forum, those contacts will not count for the individual defendant in a personal jurisdiction analysis because the defendant is deemed to be acting in his capacity as an agent for his corporate employer.  *See Newsome v. Gallacher,* 722 F.3d 1257, 1275 (10th Cir. 2013); *Origins Tech, Inc. v. Oak Equity Holdings II, LLC*, No. 2:23-cv-00326, 2023 WL 4826598, at *5 (D. Utah July 27, 2023) (citations and quotations omitted).  As Utah has not adopted this doctrine, it has no application here.  *See Origins Tech,* 2023 WL

to be the COO of Autom8tion, his communications with Autom8tion in Utah, and his performance as COO should not count as jurisdictional contacts because it was WCS Solutions who accepted the job and contracted with Autom8tion.

But it was Mr. Wilson who personally signed the COO Agreement, and it is undisputed that he personally did the work as Autom8tion's COO, which extended over a three-year period.  Mr. Wilson has not suggested (and it would be hard to believe based on the record now before the court) that he did not personally negotiate the terms of his COO Agreement with Autom8tion and personally discuss the COO Agreement with Mr. Long while Mr. Long was in Utah.  Further, it was Mr. Wilson who worked with Autom8tion and drafted the RPA between Autom8tion and WCS Solutions.  It was also Mr. Wilson who helped negotiate the asset purchase agreement (and allegedly tortiously interfered with it).[47]  And it was Mr. Wilson who allegedly improperly accessed and disclosed Autom8tion's trade secrets.[48]  Moreover, Autom8tion also asserts that it only engaged with Mr. Wilson and never engaged with any other person at WCS Solutions.  Against these contacts, the mere fact that Mr. Wilson claims that he was never physically present in Utah and only worked remotely from Canada as an agent for WCS Solutions does not defeat a finding of specific jurisdiction.  *See Burger King*, 471 U.S. at 473; *see*

---

4826598, at *5; *see also Newsome*, 722 F.3d at 1277–78 (recognizing that the Tenth Circuit has treated the  fiduciary shield doctrine as nonexistent in Utah).

[47]   (*See* ECF No. 11 at ¶¶17–31, 37–43.)

[48]   (*See* ECF No. 11 at ¶¶22–23, 44–75.)

*also Walden v. Fiore*, 571 U.S. 277, 283 (2014) (recognizing that a "nonresident's physical presence" is not required).

Regardless of whether he set foot in Utah, Mr. Wilson had an ongoing connection with Utah as he was indisputably the primary participant under the COO Agreement with Autom8tion and he supervised many of Autom8tion's business activities in Utah. And by being paid a "salary" by Autom8tion, Mr. Wilson appears to have personally benefitted from his Utah connected actions.[49] Further it is alleged that he participated in "thousands" of calls, emails, and video conferences with persons in Utah in connection with his duties as COO and in connection with his role in negotiating both the RPA and the asset purchase agreement.[50] It is also alleged that Mr. Wilson logged into Autom8tion's accounts

---

[49] Although Mr. Wilson claims that the money due under the COO Agreement was to be paid to WCS Solution which then paid him under a separate agreement, Mr. Wilson has not provided any such separate agreement supporting that position. In addition, as noted above, the COO Agreement references a "salary" to be paid to Mr. Wilson, his "employment with [Autom8tion]," that amendments could only be made by a writing signed by Mr. Wilson, and that notices were to be sent to Mr. Wilson's "residence."

[50] Frankly, the fact that Mr. Wilson, either directly or through WCS Solutions, knowingly and regularly communicated with Autom8tion may be sufficient contact to satisfy any due process concerns. *See, e.g., Trans National Travel, Inc. v. Sun Pacific International, Inc.*, 10 F.Supp.2d 79, 83 (D. Mass. 1998) (holding that defendant's contacts with the forum state plaintiff, such as calls, letters, and faxes he sent on behalf of the corporation for which he was president, were sufficient to invoke personal jurisdiction over the defendant); *see also PureHealth*, 105 F.4th at 1309–12 (recognizing that the purposeful direction and relation to requirements necessary for specific jurisdiction were establish by a showing that the defendant knowingly sent emails to customers that it knew were located in Utah).

where he accessed the confidential trade secret information that was then

misappropriated.[51]

These were not random, fortuitous, or attenuated contacts but voluntary

actions by Mr. Wilson.  He voluntarily solicited work from Utah.  He formed a three-

year contractual relationship with Autom8tion, a Utah company.  He performed the

contract by managing and directing the activities of Autom8tion.  He proposed that

Autom8tion enter into the RPA and the asset purchase agreement.  And he

(allegedly) improperly disclosed Autom8tion's trade secrets.

It is also undisputed that Mr. Wilson is the sole shareholder, president,

director, and the chief operating officer of WCS Solutions.  The Supreme Court long

ago held that, consistent with due process, an employee of a corporation that is

subject to the jurisdiction of the forum may himself be subject to jurisdiction if that

employee was the "primary participant[] in the alleged wrongdoing intentionally

directed" at the forum.  *See Calder,* 465 U.S. at 790.

Here, the record presented establishes that Mr. Wilson was the primary

participant—if not the only participant—from WCS Solutions in the activities

concerning the COO Agreement, the RPA, and the asset purchase agreement, which

are at the core of Autom8tion's claims against Mr. Wilson.  Indeed, nowhere does

Mr. Wilson present any argument that he was not the representative of WCS

Solutions who was involved in these activities.  Examining these facts and

---

[51]    (*See, e.g.*, ECF No. 11 at ¶¶23–27.)

analyzing the issue in this context only further confirms the court's conclusion that specific jurisdiction exists over Mr. Wilson.  *See Calder*, 465 U.S. at 789-90; *see also Application to Enforce Admin. Subpoenas Duces Tecum of S.E.C. v. Knowles*, 87 F.3d 413, 418 (10th Cir. 1996) (holding that specific jurisdiction existed over individual who was the president of the two corporations involved in the activities, because he was the individual who "took the actions on behalf of the two corporations" and was therefore a "primary participant" in the activities) (citations omitted).

### 3.  *Is it Reasonable to Exercise Jurisdiction over Mr. Wilson*

The exercise of specific jurisdiction over Mr. Wilson in these circumstances is also reasonable.  As an initial matter, Mr. Wilson has not identified that he will encounter any unusual burdens if he must appear in Utah.  Moreover, he has already voluntarily agreed to do so (or at least acquiesced in doing so) by directing WCS Solutions to file the underlying action in Utah state court.[52]  Because that action concerned his contract and his performance as COO of Autom8tion, Mr. Wilson had presumably already determined that there was no undue burden in appearing in Utah.  He verified the accuracy of the allegations in the complaint and he would have clearly understood that he would have to appear as a witness at trial to substantiate the asserted claims, which included breach of his COO Agreement

---

[52]     There is no forum selection clause under the COO Agreement that required WCS Solutions, which was purportedly acting at Mr. Wilson's direction, to commence the underlying action in Utah.

and fraud in the inducement of the RPA—a fraud that, if it occurred, raises issues concerning what representations may have been made to Mr. Wilson.[53]

For many of these same reasons, the judicial systems' interest also weighs in favor of having this dispute resolved in Utah.  As noted, Autom8tion and Mr. Long are both in Utah and no witnesses other than Mr. Wilson appear to be from Canada. The underlying litigation is already pending here and as a matter of efficiency it appears to be sound policy that two actions involving the same facts, the same contracts, the same parties, and the same witnesses should be resolved in the same judicial forum rather than decided piecemeal in different forums.  Further, the Third-Party Compliant is predicated on violations of Utah's Trade Secrets Act and the federal Defense of Trade Secrets Act that allegedly harmed a Utah company— claims that a court sitting in Utah has a greater interest in adjudicating than a Canadian court.

Although the court is cognizant that Mr. Wilson is a Canadian citizen and that Canada might have an interest in interpreting its own laws concerning its citizens, many of the claims asserted here (expect, perhaps, the alter-ego

---

[53]    Although Mr. Wilson argues that the burden upon him to litigate in Utah is "significant" because he may have to appear in Utah "at hearings, depositions, or trial," that argument rings hollow in these circumstances.  These burdens are already imposed upon Mr. Wilson by virtue of his participation in the underlying action, which is based on his personal employment as COO for Autom8tion and the fact that he appears to be the sole actor involved in the conduct at issue.  Mr. Wilson has not identified any additional litigation-type burdens that may be imposed upon him should this court exercise jurisdiction over him.   Moreover, in the COO Agreement Mr. Wilson had already agreed that he would furnish information and offer "proper assistance" to Autom8tion in "any litigation which [Auom8tion] … is or may become a party …."

counterclaim against WCS Solutions and the third-party alter-ego claim against Mr. Wilson) turn on issues of Utah law.  On this score it is again useful to note that by approving the commencement of the underlying action in Utah state court, Mr. Wilson, acting as WCS Solutions' president and sole shareholder, has already indicated his desire (or at least his acquiescence) in having a Utah court resolve claims, such as those under the RPA, that concern Canadian citizens and companies and arguably call for the application of Canadian law.[54]  Mr. Wilson has not presented any specific interest that Canada may have in this litigation and the court finds nothing in the record that proceeding with this action in Utah would somehow affect Canada's policies or interests.

Examining all these factors, the court concludes that proceeding with this action against Mr. Wilson in Utah would not be unreasonable.  *See Burger King*, 471 U.S. at 477 (noting that once minimum contacts have been established defendant must "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable").  Consequently, the exercise of personal jurisdiction over Mr. Wilson will not offend the Due Process Clause of the Constitution.

---

[54]   (*See* ECF No. 1-1, Ex. 2 at 4 ¶4.5 (noting that the governing law under the RPA is the law of the "Province of Ontario").)  In addition, the COO Agreement calls for the application of North Carolina law.  By asserting breach of the COO Agreement in the underlying action, Mr. Wilson, acting through WCS Solutions, has provided further support that he is not averse to having a Utah court exercise jurisdiction over claims arising under the law of different jurisdictions.

CONCLUSION

Accordingly, based on the foregoing,

IT IS ORDERED that Third-Party Defendant George Wilson's motion to dismiss (ECF No. 22) is DENIED.

DATED this 13th day of August 2024.

BY THE COURT:

Hon. Ann Marie McIff Allen
United States District Judge